Mr. Pomeroy, Madam Clerk, may it please the Court, my name is Blair McKeown and I represent the defendant appellant, Mr. Donald Ritchie. There are three issues in this case, such as an appeal from a section, denial of Mr. Ritchie's section 2255 motion. The first issue involves ineffective assistance of counsel, and there are two main sub-issues to that involving search and seizure issues and an allegation that Mr. Ritchie's trial attorney did not argue effectively drug quantities at sentencing. The second issue is a Brady v. Maryland issue. And the third issue, on which a court certificate of appealability was not granted by the district court, is the issue of whether Mr. Ritchie is entitled to resentencing under Blakely Booker. Although the third issue does not have a certificate of appealability, there have been some developments in the law that I'd like to raise on that issue. Well, if it's uncertified, don't we have authority on point that is directly contradictory to your position? That's correct. So if it's an uncertified issue and there's a case standing in your way, do you really want to use up your ten minutes talking about that issue? There was a ‑‑ I think it's an important issue. And just very briefly, I cited Burton v. Waddington, which the U.S. Supreme Court granted certiorari for. That was decided against Mr. Burton on a jurisdictional issue. So I wanted to update the citation on that. And also mention Cunningham v. California. And I'll leave it at that. Okay. Thank you. The search and seizure issue, there's a taint. There are subissues to that. And the main issue that I'd like to address involves the taint issue. The court found that the illegal ‑‑ the initial entry into the East 17th Avenue residence where Ms. Horner lived was illegal. And that's not disputed? That's not disputed. The question is whether that tainted the subsequent search warrant that was granted and executed. And considerable evidence seized at that residence was used at trial against Mr. Ritchie. The standard, I believe, is the independent source standard. The U.S. v. Mulder, is this court's case? Well, before we get to independent source, though, don't we first have to find that the affidavit was actually tainted? And we've got a factual determination by Judge Holland, or the magistrate judge, that there was nothing in the affidavit other than boilerplate, whatever you want to call it, of the affiant Anchorage police detective. Yeah. So ‑‑ Yeah, there's two ‑‑ I think there's two factual matters which involve the taint. First is this boilerplate attachment A type of thing. I think my able counsel, Mr. Pomeroy, at trial showed that this attachment had been attached to other search warrants in the same case. And we've conceded that there's sufficient evidence in the district court to find this is a generic boilerplate type thing. We still maintain the argument that the way it was presented to the district court involved a taint. But the court ruled against us. But I think the closer question involves paragraph 47 of the affidavit. And that paragraph states that on ‑‑ and this is by Detective ‑‑ I was trying to remember how to pronounce his name. I think it's Cook, Detective Cook. On the 29th of April, I responded to the East 17th Residence. At the residence, I contacted Heather Horner, who told me Don was not at home at the moment, but did acknowledge his living there. And Heather allowed me to walk through and ensure that Don was not at home and then ordered me out of the home. So that paragraph made a pretty critical nexus that Don Ritchie lived there. We were arguing, again, in the next section that I want to address this morning in the probable cause, that there was only a pretty tenuous information in the affidavit that Don Ritchie was connected to the East 17th Avenue Residence and that illegal activity was happening at that residence. So the independent source doctrine has two parts of it. The first part is a question under Mulder, as this court noted, which whether the information obtained in a legal search would prompt the officer to get the search warrant initially. If it prompted the officer to get the search warrant, then that's not an independent source. But there's a second part of it, and that's whether the information observed or obtained in the illegal search by the officer was presented to the magistrate in the search warrant and whether that information affected the decision of the magistrate to grant the search warrant. Help me out here. You've called our attention to paragraph 47, and I'm not now sure. Are you suggesting that Don's living there was a disputed issue and somehow his going in there and getting that into the affidavit somehow corrupted the probable cause showing on the magistrate judge? Or are you focusing on observations of meth kind of paraphernalia? No, I'm focusing on that paragraph that Don Ritchie lives there. I think that's, from our point of view, the stronger argument. Okay, so what's the theory then? I'm still missing the theory. There was a co-defendant, or not a co-defendant, but a co-defendant, Adam Hankins, who gave information that's included in the search warrant, pretty extensive information. And in that, he did say that Don Ritchie lived and manufactured methamphetamine at that residence. And isn't there another informant, JP103, I'm looking at ER page 184, who corroborates what Hankins said? Well, that was kind of like a, it wasn't, our argument is that it's stale. There's no, and it could be just rumors in the drug world. I'm looking at the paragraph that, or subparagraph, I don't know what it is, numbered four at the top of page 184 of the excerpt, page 18 of the affidavit. JP103 told the officers about a man she knows as Don, who's a meth cook that lives around the corner from Tracy and Michelle's house, in a home she described. Matching description and the directions given by JP103, the officers located the residence at 2729 East 17th. And then they got a phone number, which came back to that address from that source as well. Yeah, I have to concede that the district court used that as corroboration, but our argument was that it was stale. It doesn't have time, place, who, when, where at that residence. And, of course, this is a criminal milieu informant. Don't we then go down to paragraph 40 that says on 429.99, I conducted an interview with Hankins, and then in paragraph 41, Hankins identifies Don Ritchie as the cook who lives at that address and who cooks methamphetamine nightly? That's not stale, is it? No. Hankins' information is not stale, but he's clearly from the criminal milieu. And under Illinois v. Gates, I think we're entitled to corroboration. And our argument is that JP103 does not cut it, does not constitute corroboration. Because she could have been away in the past. Yes. You know, who knows when she's gone. And so then you get to paragraph 47, and you're saying that's improper corroboration because it's tainted. Because it came from the illegal entry. So that's our argument on that point. Quickly turning quickly to the drug quantity of sentencing issue, the main issue is whether there was a tactical reason for failing to request an evidentiary hearing. We argue that there was. This was a case where the tale of relevant conduct wagged the dog. It's kind of like the inkblot theory that the quantity spread out from a small. Mr. Ritchie was contacted at the Executive Suites Hotel with 10.8 grams, and it just lost him from there. And our argument is on ineffective assistance on that. The Brady issue is our last issue. Yeah, we have. We've read the briefs, so I think we know them. I'll give you a minute for a rebuttal because you're over time. Great. Thank you very much. May I please the Court? My name is Richard Pomeroy. I'm an assistant U.S. attorney up in Alaska and briefed this case. The overall issue is that Mr. Ritchie did receive effective assistance of counsel in his at the trial level. Did you try the case, by the way? No, I did not, Your Honor. I have the honor of just doing the habeas petitions, not the trials. A reward for honor. On the first issue, there's one point, I think factual point, that I'd like to clarify based upon what Mr. McKeown was saying, based upon the paragraph, the corroborating information in paragraph 47 of the Ms. Horner stated that Donald Ritchie did not live or was not present at the 17th Avenue. The sequence which is set out in greater detail in the magistrate judge's reports and recommendations show that the officers went to the 17th Avenue residents, asked Ms. Horner if Donald Ritchie was there, and then asked for permission to confirm that. The issue of where the, quote, search was illegal was that an issue of whether Ms. Horner consented or not. As the magistrate judge pointed out in his report and recommendation, when he found that consent was not given, the officers' recollection six years later was not sufficient to bear the government's burden. But the conversation that occurred before the request to enter the residence is what is presented in paragraph 47, is confirming whether or not Mr. Ritchie was living in that residence. As the Court already pointed out, there's additional information in the affidavit from Mr. Hankins, from the JP103, and also in paragraph 48 of Detective Cook's affidavit, that there's a hotline report of meth manufacturing occurring also at that residence, which provides sufficient information independently to corroborate Mr. Hankins' direct observations. Mr. Hankins was testified at trial and was subject to cross-examination at trial. And as Judge Holland points out, his credibility was certainly the key issue at trial. Jumping a little bit, the principal issue that Mr. Ritchie would present as far as failing to request an evidentiary hearing was to, again, test Mr. Hankins' credibility. And as Judge Holland points out, the Court had opportunity to evaluate Mr. Hankins' credibility, found him credible, and nothing additionally would be presented at an evidentiary hearing on the drug quantity that was not presented in the objections to the pre-sentence report. The objections... I think we have that one. Could I have you address the Brady issue? I'd be happy to, Your Honor. In particular, why this, what could be considered exculpatory evidence, was not turned over? In my review of the materials, I could not find the Horner statement in any of the U.S. attorneys. You couldn't find what? I could not find Ms. Horner's statement in the materials that the United States attorneys had. My conclusion is that we just did not get that statement or were not aware of it. I have no explanation of why it was not produced. Believe me, I wish I did. So you're saying that, for some reason, the Anchorage Police Department simply didn't give it to the AUSA who was prosecuting the case? Is that what you think? That's my best guess, but I don't want to make a factual representation. That's the best conclusion. That was an interview of her, right? An Anchorage Police interview of Horner? Or was it the Federal Office? Police, EA, I'm not sure exactly. I don't recall exactly who interviewed her. Well, that's the difference, doesn't it, in terms of in whose possession the statement resided? Although I suppose if it was a Drug Task Force agent, it doesn't matter what type of state or federal office. It was part of a Drug Task Force. And for some reason, it just didn't get to the U.S. attorney. Is that what you think? I cannot find it in the files, and the people who did try the case do not recall seeing it. So it's a regrettable, inadvertently not provided. But as the District Court concluded, thankfully, it was a harmless error. The District Court's findings that the information in that statement was readily available to Mr. Ritchie's defense I think is readily supportable, because Ms. Horner had a special relationship with Mr. Ritchie. They had fathered a child together. Variously, she was described as his fiancée. She did testify at the suppression hearing, or the hearing to suppress the confessions that Mr. Ritchie made upon arrest, such as that he had participated in a couple meth cooks and corroborating some of the information that Hankins had provided by teaching others how to manufacture methamphetamine. She was with him when he was arrested at the motel. She was also present at sentencing, and according to the transcripts, prepared to testify on Mr. Ritchie's behalf if she'd been called. But ultimately, it's speculative as to whether or not she would have disclosed this information to Mr. Horner. There's no evidence. I mean to Mr. Ritchie, right? They're just going on this relationship and these circumstances. They say, well, no harm, no foul, because she would have told him anyway. I don't think it's speculation that she was cooperating with Mr. Ritchie in his defense. No, no, it's speculation that because she was doing that, she would have told him about the exculpatory evidence that she had provided to the or exculpatory statement she had provided to the task force. That's what we have to accept. Yes. I mean, there's no specific evidence that she said this to Mr. Ritchie or his attorney. And we don't have a declaration or testimony from his trial counsel that he didn't know this information? No. Well, the magistrate judge did find that the evidence that was withheld didn't result in a reasonable probability of a different result at trial. Correct. That it would not have. And are you arguing that this conclusion is supported by the record as a whole? Yes, Your Honor. Because the magistrate judge and the district judge sort of took two different tacks in analyzing this situation, but reached the same conclusion that there was no Brady violation, so that even if we were to, you know, then the next step would be, you know, covered by the magistrate judge's analysis that the information itself was not of minimal value and would not result in a reasonable probability that there would be a different result. So on either theory, either approach, you're saying it's adequate? Yes, Your Honor. And then how about combining them both? It makes it doubly acceptable. Exactly. And I think maybe as far as a point to sum up on and conclude, I couldn't have said it better myself. Well, I'm not advocating that every one of these issues be handled by way of a recommendation in R&R from the magistrate judge, but sometimes we have to take it as we find it. And also I think that the district judge, since he was, you know, the trial judge, and it was also the judge at sentencing and such, was in a better position to sort of, I mean, he saw Ms. Horner at sentencing and such, and also I believe Judge Holland also was involved in the asset forfeiture case where Ms. Horner made a claim for $3,000 and a pistol that was seized at the 17th Avenue address, in which actually Mr. Ritchie helped her in making that claim. That case actually resulted in a reported decision before this Court at 342 Fed 3rd 903. That was the forfeiture case? That was the forfeiture case. Okay. I think we have the argument. Thank you very much. Thank you, Your Honors. Thank you, Your Honor. Sure, go ahead. If I could just have one quick minute. No, go ahead. Very quickly, the statement of Heather Horner is in the excerpt at 151, and it is a federal form statement to federal special agents. Okay. And you agree that the record is that for whatever reason it didn't go to the U.S. Attorney and that's why it wasn't produced, or do you know? We don't know, but that's the record below, that it wasn't produced. And the Court, there's three issues to Brady. There's favorable, and they found that it was favorable. Suppressed, and it was found to be suppressed. Now, the materiality issue was not addressed, actually, by the district court, by Judge Holland, in his decision. Right. He came up with a different. He used a doctrine to shortstop that, where he said that because of the relationship between Ms. Horner and Mr. Ritchie, but I've cited case law, especially the Perdomo case and so on, and I think the key question is whether it was speculative. Just because a co-defendant might know it or might have been produced to a public defender in another case does not meet that doctrine. And we would argue that the materiality question wasn't reached by the district court because of the shortstop based on the Schaefer case. And I don't know what the court's – I filed objections to it, to that determination. So I would – it would have to be remanded, I believe, to the district court if this court finds that the shortstop doctrine does not succeed. Thank you very much. Thank you. All right. The case just argued is submitted. We thank both counsel for coming all the way down to argue. Of course, maybe it's warmer here than it is where you live. And more snow. And lighter. Anyway, thank you for being here, and that will conclude our arguments for today. The case argued is submitted.
judges: Fisher, Tallman, Mills